## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| | § |
| **In re:** | § **Chapter 11** |
| | § |
| **TRI-POINT OIL & GAS PRODUCTION** | § **Case No. 20-31777** |
| **SYSTEMS LLC,** | § |
| | § **(Jointly Administered)** |
| Debtors.[1] | § **(Emergency Hearing Requested)** |

## DECLARATION OF JEFFREY MARTINI IN SUPPORT
## OF CHAPTER 11 PETITIONS AND FIRST DAY PLEADINGS

I, Jeffrey Martini, being duly sworn, depose and say:

1.      I am the Chief Executive Officer and Chief Financial Officer of Tri-Point Oil & Gas Production Systems LLC ("Tri-Point") and certain of its affiliates, the debtors and debtors in possession in the above-captioned cases (collectively, the "Debtors").  I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtors.

2.      I have served as the Chief Executive Officer of the Debtors since January 21, 2020. The previous Chief Executive Officer, Bill Ebanks, resigned on January 17, 2020.  On January 21, 2020, I was also appointed as a member of the Board of Managers of FR Tri-Point LLC.  I have served as the Chief Financial Officer of the Debtors since March 31, 2019.

3.      Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtors' senior management, my review of relevant documents or, based on my experience and knowledge of the Debtors' operations and

---

[1] The Debtors in these chapter 11 cases, along with the last four digits of each Debtor's federal tax identification number, are as follows: Tri-Point Oil & Gas Production Systems LLC (2419); FR Tri-Point LLC (3967), Tri-Point Services GP, LLC (5463), and Tri-Point Services, LLC (0783).  The address of the Debtors' headquarters is: 5555 San Felipe, Suite 1250, Houston, Texas 77056.

financial conditions, and my opinion.  In making this Declaration, I have relied, in part, on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration.  If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

4.      To resolve immediate issues that may cause irreparable harm if not promptly addressed, the Debtors intend to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with the chapter 11 cases (the "Chapter 11 Cases").[2]  I submit this declaration in support of the Debtors' (a) voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the First Day Pleadings.  I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading up to these Chapter 11 Cases.

5.      This Declaration is divided into two parts.  Part I provides background information about the Debtors, their business operations, their corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Cases.  Part II sets forth the relevant facts in support of each of the First Day Pleadings.

## **PART I – BACKGROUND**

### **A.  Overview**

6.      The Debtors filed these Chapter 11 Cases to conduct an orderly liquidation of their assets and wind down the remaining operations of the company.  During the weeks prior to March 16, 2020 (the "Petition Date"), the Debtors and their fiduciaries diligently worked to market their

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

assets to a potential stalking horse bidder and secure postpetition financing in order to facilitate a going concern sale of the business.  In light of current market conditions in the oilfield services sector and the global economy, the Debtors were informed by a proposed stalking horse bidder that it was ceasing due diligence and would not enter into an asset purchase agreement for a sale of the business as a going concern as of March 13, 2020.  Without a commitment from a stalking horse bidder, the Debtors were unable to secure sufficient postpetition financing in order continue ordinary course operations during an extended post-petition marketing process.  However, the Debtors were able to negotiate for additional availability under its pre-petition revolving facility with Wells Fargo to conduct an orderly liquidation through these chapter 11 cases. The Debtors will (i) complete a limited amount of work in progress, (ii) continue to collect accounts receivable, and (iii) retain a liquidator and assist the liquidator with the process of preparing the Debtors' assets for sale.  Concurrent with the liquidation process, the Debtors intend on seeking confirmation of a plan of liquidation.

## B.  The Debtors' Business

7.     The Debtors together form an oil and gas production and processing equipment company headquartered in Houston, Texas.  The Debtors design and manufacture production equipment for the oil and gas industry and their services include engineering and design, installation, start-up, and after-market field maintenance to provide custom engineered and configured solutions to upstream and midstream customers.  Production equipment is used by producers of oil and gas for the purpose of promoting the separation of oil, water and gas for discrete processing and handling.  In some cases, the Debtors provide modular production systems, comprising an integrated field facility installed between the well and the pipeline for oil and gas processing applications.  Generally, production equipment is composed of pressure vessels, piping,

valving, instrumentation and electrical components in support of single or multiple well arrangements. Such modular production equipment is manufactured at the Debtors' offsite regional manufacturing locations, with unique features and benefits, including ease of transport and speed of installation.

8. In addition, the Debtors provide services, including training, on-site service, testing services, and aftermarket maintenance and repair. The Debtors also own and operate supply stores, located in the Permian Basin ("Permian"), Mid-Continent ("Mid-Con"), and Rocky Mountain ("Rockies") regions.

9. In the fourth quarter of 2016, the Debtors purchased three companies with strong regional brands and experienced management teams which were integrated into Tri-Point. With these acquisitions, the Debtors have fabrication facilities in each of the Permian, Mid-Con, and Rockies regions. Specifically, (i) the Permian region has two manufacturing facilities and three service facilities located in Midland, Texas; (ii) the Mid-Con region has three manufacturing locations and a service facility; (iii) the Rockies region has two manufacturing and service facilities located in Brighton, Colorado and Loveland, Colorado. The locations in each of the regions generally have rolling, cutting, bending, fabrication, testing, finishing, painting and aftermarket service capabilities.

10. During 2019, the Debtors made a number of organizational changes to improve profitability, including eliminating excess management layers across the company, reducing labor costs, centralizing transactional finance functions, and reorganizing the field service and supply store business. The Debtors also made a number of structural changes, including closing its East Texas manufacturing facility located in Kountze, Texas.

**C. The Debtors' Corporate Structure**

11.    Tri-Point is a privately held company formed in October 2015 under the laws of Delaware.  It is an affiliate of FR Tri-Point LLC, Tri-Point Services GP, LLC, and Tri-Point Services, LLC (collectively, with Tri-Point, the "Company").  FR XIII Charlie AIV, L.P. ("First Reserve") is the Company's equity sponsor.  First Reserve has not received any dividends or distributions from the Company and has not charged any management fees.



10426333v8

12.     As of March 13, 2020, the Debtors had approximately 305 full-time employees.  As of the Petition Date, the Debtors intend to provide WARN Act notice to 290 of these employees, informing them that they will be terminated 60 days from the date of notification.

### D.  The Debtors' Management

13.     The Debtors' remaining core management team consists of the following individuals:

| Name | Position |
|------|----------|
| Jeffrey Martini | Chief Executive Officer and Chief Financial Officer |
| Daniel Martinez | Chief Operating Officer |
| Craig Freking | Vice President – Rockies & Mid-Con |
| Tim Gonzalez | Vice President – Permian |
| Herman "HC" Hatfield | General Manager, Aftermarket Service & Supply |

### E.  The Debtors' Capital Structure

14.     The following description of the Debtors' capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

15.     Tri-Point and certain affiliates were parties to a Credit Agreement, a Promissory Note, and a Guarantee and Security Agreement dated as of December 20, 2017 (as amended, collectively, the "Wells Fargo Loan Agreement"), among (i) Wells Fargo Bank, National Association ("Wells Fargo"), as administrative agent, the lenders party thereto (the "Tri-Point Secured Lenders"), (ii) FR Tri-Point Holdings LLC, (iii) FR Tri-Point LLC, (iv) Tri-Point, (v) Leed Fabrication Services, LLC and (vi) SFI Oil & Gas Production Systems, LLC as Borrowers,

and Tri-Point Services GP, LLC and Tri-Point Services, LLC as Guarantors.  The amount initially advanceable under the Wells Fargo Loan Agreement was $45,000,000.00.  The estimated current amount due under the Wells Fargo Loan Agreement is approximately $36,900,000.00.

16.     Pursuant to the Wells Fargo Loan Agreement, Wells Fargo has a lien on substantially all of the Borrowers' and Guarantors' assets.  In March 2018, to induce Wells Fargo to continue lending as the Company expanded its operations, First Reserve provided a letter of credit (through Citibank) for the benefit of Wells Fargo to backstop the repayment of the Wells Fargo Loan Agreement (the "FR Letter of Credit").  The original face amount of the FR Letter of Credit was $10 million.  Beginning in the summer of 2019, as Tri-Point's liquidity declined, First Reserve upsized the FR Letter of Credit on three occasions so that Tri-Point could access more loans from Wells Fargo to fund operations.  The FR Letter of Credit is currently outstanding in the face amount of $28,000,000.

17.     Leading up to the filing of the Chapter 11 Cases, the Debtors entered into a number of forbearance agreements with Wells Fargo, including most recently the Third Amended Forbearance Agreement and Ninth Amendment to Credit Agreement, dated as of February 14, 2020 (the "Forbearance Agreement"). Among other things, under the Forbearance Agreement the Agent and the Lenders agreed to forbear from exercising any of their rights and remedies under the Wells Fargo Loan Agreement until the later of any default under the Forbearance Agreement or March 6, 2020.

18.     To provide necessary working capital, begin a marketing process for the Debtors' assets, and continue employing professionals to prepare for these chapter 11 cases, Tri-Point entered into a Senior Secured Promissory Note dated February 13, 2020 with First Reserve in the initial aggregate principal amount of $3,000,000.00 (the "Bridge Loan").  The Bridge Loan is

secured by the same collateral as the Wells Fargo Loan Agreement.  In connection with the Bridge Loan, Tri-Point, Wells Fargo and First Reserve entered into an intercreditor agreement dated February 13, 2020 (the "Intercreditor Agreement").  Pursuant to the terms of the Intercreditor Agreement, First Reserve and Wells Fargo have *pari passu* liens on the shared collateral, the proceeds of which will be used first to repay amounts due under the Wells Fargo Loan Agreement and then to repay the Bridge Loan.  The current balance under the Bridge Loan is $3,000,000.

19.     In addition to the secured loans described above, Tri-Point has unsecured debt. Pursuant to the Loan Agreement, dated as of December 12, 2016, between Tri-Point and its immediate parent, FR Tri-Point Holdings LLC ("FR Holdings"), Tri-Point borrowed approximately $9,000,000 in the original principal amount from FR Holdings (the "Unsecured FR Loan") to fund the acquisition of certain assets and for working capital.  The Unsecured FR Loan was intended as a short-term bridge loan but a refinancing has not been possible due to Tri-Point's financial difficulties.  Interest on the Unsecured FR Loan has been paid-in-kind and there is currently approximately $11,208,657.52 in principal outstanding.

20.     The Debtors estimate that their general unsecured trade debt is approximately $13,400,000.

**F.  Events Leading to Chapter 11 Cases**

21.     Like many companies in the oilfield services industry, the ongoing downturn in oil and natural gas prices and other industry-related challenges have negatively affected the Debtors' liquidity position through 2019 and the beginning of 2020.  The Debtors retained a consultant to advise on potential liquidity options on September 18, 2019.  In early 2020, the Debtors determined that there was no out-of-court restructuring or refinancing option available to it.

22.     On January 16, 2020, the Debtors engaged Porter Hedges LLP to advise the Debtors regarding their strategic alternatives and subsequently instructed Porter Hedges to prepare for the filing of these Chapter 11 Cases.  On January 24, 2020, the Debtors engaged AlixPartners, LLP as their restructuring financial advisor.[3]

23.     On February 11, 2020, the Debtors retained Parkman Whaling LLC ("Parkman Whaling") as their investment banker to assist with identifying, and marketing to, parties that would potentially be interested in acquiring some or all of the Debtors' assets.  Parkman Whaling created a data room of due diligence materials, prepared a confidential information memorandum, contacted numerous financial and strategic parties, and assisted the Debtors in responding to diligence requests from these parties.  The Debtors received a draft term sheet from a potential stalking horse bidder and conducted advanced due diligence with this party until March 13, 2020, when the party informed the Debtors that it was ceasing diligence and would not become a stalking horse.   Faced with insufficient liquidity to continue ordinary course operations without the prospect of a stalking horse bidder, the Debtors filed these cases to conduct an orderly liquidation of their assets and wind down any remaining operations.

### PART II – FIRST DAY MOTIONS[4]

24.     I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe the relief sought in each First Day Motion will allow for an orderly liquidation in these Chapter 11 Cases and is critical to maximizing the value of the estates.  Further, it is my belief that the relief sought in the First Day Motions is in each case narrowly tailored and

---

[3]  AP Services, LLC, an affiliate of AlixPartners LLP, was retained by the Company on September 30, 2019, to perform interim management and enterprise improvement services.  On behalf of the Company, First Reserve paid AP Services' fees and expenses in connection with the September 30, 2019 engagement.  The AP Services, LLC engagement was terminated upon the activation of the AlixPartners, LLP engagement on January 24, 2020.

[4] Capitalized terms not otherwise defined in this section have the meanings ascribed to them in the applicable motion.

10426333v8

necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and their stakeholders.

25.     Below is a brief discussion of the Debtors' operational First Day Motions and an explanation of why, in my belief, such motions are critical to the successful prosecution of these Chapter 11 Cases.  More fulsome descriptions of the bases for the relief requested can be found in each relevant First Day Motion.  Capitalized terms used but not otherwise defined in this section of this Declaration shall have the meanings ascribed to them in the relevant First Day Motions.

**A.  Administrative and Procedural First Day Pleadings**

### i.  Joint Administration Motion

26.     I believe that joint administration would not adversely affect any creditors' rights because the Debtors' motion requests only the administrative consolidation of these cases for procedural purposes. It does not seek substantive consolidation of the Debtors' estates. Accordingly, because joint administration will create efficiencies in the bankruptcy process without affecting the substantive rights of creditors, I believe that joint administration of the Chapter 11 Cases is in the best interests of the Debtors, their estates, and all other parties in interest and should be granted in all respects.

### ii.  Consolidated Creditor List and Schedules Extension Motion

27.     Under the circumstances, a thirty-day extension to file the Schedules and Statements is warranted. The Debtors' record keeping makes separating liabilities by debtor entity difficult and time consuming. To prepare the Schedules and Statements, the Debtors must compile information from books, records, and documents relating to creditor claims, as well as the Debtors' assets. Among other reasons, because of (i) the size and scope of the Debtors' prior businesses, (ii) the limited staffing available to perform the required internal review of their accounts and

affairs, and (iii) the focus of attention to matters incident to the commencement of these Chapter 11 Cases, the Debtors will not be able to assemble all of the information necessary to complete and file the Schedules and Statements by the applicable deadline.

28.     The Debtors, while separate legal entities, have a large number of common creditors. Filing separate lists of the top 20 unsecured creditors and separate creditor matrices in their respective cases would generate a variety of lists with a large number of duplicate entries. Consolidating the list of creditors to one list between the Debtors of the 30 largest unsecured creditors is in the best interest of the Debtors, their estates, and their creditors to avoid unnecessary duplication and to ensure administrative efficiency.

### iii.   Claims Agent Retention Application

29.     Bankruptcy Management Solutions, Inc.'s, d/b/a Stretto ("Stretto") retention is the most effective and efficient manner of noticing the creditors and parties in interest of the filing of the Chapter 11 Cases and of other developments in the Chapter 11 Cases. I am informed that Stretto has acted as the claims and noticing agent in numerous cases of comparable size.

30.     I believe Stretto's retention to act as an agent of the Court, as an independent third party with significant experience in this role, is in the best interests of the Debtors as well as their estates and creditors.

## B.  Operational First Day Pleadings

### i.   Cash Collateral/DIP

31.     The Debtors seek relief under the DIP Motion to utilize their cash and to obtain additional financing to prosecute the Chapter 11 Cases and conduct an orderly liquidation of their assets and wind-down of the Debtors' remaining operations.  The Debtors need the immediate use of cash collateral and additional financing to fund operations, maintain the value of their assets

and facilitate an orderly liquidation and wind-down.  Otherwise, the Debtors will experience irreparable harm because they cannot pay their pay professionals or employees without the use of cash collateral and additional financing.

32.     Beginning on or about February 11, 2020, Parkman Whaling and AlixPartners professionals screened their proprietary database of potential DIP lenders that might have an interest in providing DIP financing, focusing on DIP size, industry and potential to provide the DIP financing in a second lien position.  Ultimately, Parkman Whaling and AlixPartners contacted five potential lenders.  Only one party expressed any interest in exploring a potential financing, but only on a priming basis and at a much higher interest rate than the proposed DIP Facility.  Based on the initial feedback from the potential lenders contacted and the opinions of Parkman Whaling and AlixPartners, I believe that expanding the scope and length of the DIP marketing process would not yield any material interest in providing DIP financing without a priming lien to the Agent or on better terms.

33.     To avoid an expensive, time consuming priming fight with the Debtors' prepetition lender at the beginning of the Debtors' Chapter 11 Cases, I believe the Debtors exercised their reasonable business judgment in selecting the financing proposed by Wells Fargo.  The Debtors are seeking approval of a first priority priming senior secured debtor in possession credit facility consisting of approximately $6 million in commitments by Wells Fargo, as administrative agent and the lenders thereunder.  I believe the DIP Facility is an exercise of the Debtors' business judgment because it will provide sufficient liquidity for the Debtors to maintain operations in order to conduct an orderly liquidation and wind-down of the remaining operations.

34.     The Debtors are seeking the continued use of Cash Collateral on the terms set forth in the Interim Order, subject to certain limitations.  The Interim Order was carefully calibrated and

10426333v8

highly negotiated, and provided for the use of Prepetition Collateral in exchange for a comprehensive adequate protection package.  That package provides safeguards to protect against the post-petition diminution in value of the collateral resulting from the use, sale, or lease of the collateral by the Debtors and the imposition of the automatic stay.  Significantly, the adequate protection package resolved the use of Cash Collateral on a consensual basis avoiding foreseeable litigation that would have been value destructive and unhelpful for moving the Debtors' cases forward.

35.     The Debtors propose to provide an adequate protection package as set forth in the Orders.  The DIP Secured Parties and the Pre-Petition Term Lender would not have consented to the Debtors' use of collateral, including Cash Collateral, without the adequate protection provided in the Orders.  Obtaining the use of collateral consensually saved the Debtors' estates amounts far in excess of what it could cost to litigate non-consensual use.  I believe that the proposed adequate protection in the Orders and Ratification Agreement is necessary and sufficient for the Debtors to continue to use Cash Collateral.

36.     In addition, the refinancing of the Pre-Petition ABL Obligations from the Debtors' receipts during the interim period and the conversion of all of the Pre-Petition ABL Obligations into Post-Petition Obligations upon entry of the Final Order (the "Roll-Up"), as an exercise of the Debtors' sound business judgment. Prepetition secured claims are routinely paid outside of a plan of reorganization, including through a "roll-up" where the proceeds of the debtor in possession financing are used to pay off or replace prepetition debt. Refinancing prepetition debt is a common feature in debtor in possession financing arrangements, particularly when accomplished pursuant to a final order.

37.     Inclusion of the Roll-Up was a topic of extensive negotiation between the Debtors and the Agent and was a necessary condition to obtaining the DIP Facility. The Debtors would not have access to any new money financing without the Roll-Up. As explained above, the Debtors extensively explored third party debtor in possession financing, which would not have required a roll-up, but did not receive a viable proposal from any such party.

38.     Although the Roll-Up will take effect upon the entry of the Interim Order, any Committee or party-in-interest (other than the Debtors) will retain the right to object to the Roll-Up before the hearing to approve entry of the Final Order, and may challenge the Agent's liens even after entry of the Final Order.[5] In other words, the Roll-Up does not insulate the Agent from any challenge to the rolled-up portion of their claims or liens. I believe that this adequately preserves the rights of all parties.

### ii.  Cash Management Motion

39.     The Debtors' cash management system is used to collect, transfer, and disburse funds generated from their operations and to facilitate cash monitoring, forecasting, and reporting, while minimizing costs. Cash management flow is characterized in a linear process.  All accounts are held at Wells Fargo Bank, N.A. ("Wells Fargo"), which is the Debtors' senior secured lender and proposed DIP lender. Receipts from operations, which include checks, ACH, and wires, flow into a collections account (x-1794). The collections account is a "Lockbox Account" and the funds in this account are swept daily to the Wells Fargo revolving credit facility. The operating disbursement account (x-1786) draws on the Wells Fargo credit facility as demanded by the Debtors' business operations. The operating disbursement account funds operating payments,

---

[5]     Pursuant to section 4.1 of the Interim Order, any committee has 60 days from the date of its appointment and other parties in interest have until 75 days after the Petition Date to challenge the Agent's and Lender's pre-petition liens or assert claims against the Agent or the Lenders.

which include checks, ACH, and wires, and debt service. Further, all payroll disbursements, including insurance and tax withholdings, are drawn from a zero balance account (x-1689), which draws from the operating disbursement account (x-1786) one business day before the payroll date. Payroll disbursements are drawn on a bi-weekly cycle, with one week in arrears. Lastly, the Debtors have a dormant holding account (x-1671) and a buffer account with no activity (x-1663). The Debtors seek to maintain that system on a postpetition basis to ensure that the Debtors are able to fund operations during the case.

40.     The proposed postpetition cash management system (the "Cash Management System") includes three bank accounts (collectively, the "Bank Accounts") and a number of corporate credit cards for employees under the WellsOne Commercial Card Agreement, dated on or around May 9, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "Card Agreement"), between the Debtors and Wells Fargo Bank, N.A, all controlled by the Debtors and all with Wells Fargo (the "Bank"). The indebtedness owed by Debtors to Wells Fargo in respect of the Card Agreement was secured by certain collateral (the "Collateral") pursuant to the terms of Wells Fargo Loan Agreement. The Debtors' three Bank Accounts and a cash management schematic is attached to the Cash Management Motion as **Exhibit A**.[6]  The Bank is included in the U.S. Trustee's List of Approved Depositories.

41.     Contemporaneously with the filing of this Motion, the Debtors have filed a motion to obtain postpetition financing from Wells Fargo. The proposed financing will be provided to the Debtors' operating disbursement account (x-1786) at Wells Fargo and then payments will be

---

[6] The Debtors believe that Exhibit A is a complete list of their Bank Accounts. To the extent that any Bank Account has been omitted from that list, the Debtors request that the interim and final orders granting the relief sought herein apply to all Bank Accounts actually in, or linked to, the Cash Management System.

disbursed from this account pursuant to the postpetition financing budget (the "DIP Budget"). Any customer receipts will be held in a separate lockbox (x-1794) bank account at Wells Fargo.

**Business Forms and Investment and Deposit Practices**

42.     In the ordinary course of business, the Debtors may use a number of checks, business letterhead, purchase orders, invoices, envelopes, promotional materials, and other business forms and correspondence (collectively, the "Business Forms").  Given that the Debtors used the Business Forms prepetition, they do not include references to the Debtors current status as debtors in possession.  Most parties doing business with the Debtors undoubtedly will be aware of the Debtors' status as debtors in possession as a result of the publicity surrounding the Chapter 11 Cases and the notice of commencement of the Chapter 11 Cases that will soon be provided to parties in interest.  Requiring the Debtors to change existing Business Forms would unnecessarily distract the debtors from their restructuring efforts and impose needles expenses on the estates without any meaningful corresponding benefit.

43.     I believe that requiring the Debtors to change existing Business Forms would unnecessarily distract the Debtors from their restructuring efforts and impose needless expense on the estates, without any meaningful corresponding benefit.

**Intercompany Transactions**

44.     In the ordinary course of business, Tri-Point makes payments on behalf of the other Debtors (the "Intercompany Transactions").  Included in such Intercompany Transactions is the funding of payroll obligations associated with its employees.  The operating disbursement account (x-1786) is responsible for facilitating the cash transfers among the following accounts: collections account (x-1794), Wells Fargo credit facility, and payroll disbursement account (x-1689).

45.     The Debtors seek authority to continue the Intercompany Transactions postpetition. Because the Debtors engaged in the Intercompany Transactions on a regular basis prepetition and such transactions are common for enterprises like the Debtors, the Debtors believe that they may continue the Intercompany Transactions in the ordinary course, as contemplated by section 363(c)(1) of the Bankruptcy Code, without court approval.  Nonetheless, out of an abundance of caution, the Debtors seek express authority to continue engaging in the Intercompany Transactions. The Debtors do not seek authority to make any Intercompany Transactions to non-Debtor entities.

46.     I believe that the failure to continue the Intercompany Transactions in the ordinary course of the Debtors' business would unnecessarily hinder operations.  I believe that, absent the continuation of the Intercompany Transactions, the Debtors' ability to operate their business during the Chapter 11 Cases would be prejudiced, and their ability to maximize value for creditors would be reduced.  Avoiding such hindrances by continuing the Intercompany Transactions is, I believe, in the best interests of the estates.  The Debtors therefore request that the Court authorize them to continue the Intercompany Transactions in the ordinary course of business.  I believe the relief requested in the Cash Management Motion is in the best interests of the Debtors, their estates, and all parties in interest.

### iii.  Employee Wages Motion

47.     As described more fully in the Employee Wages Motion, the continuation of compensation (both in the form of salary and wages and benefit programs) for the Debtors' employees (each an "Employee"), is critical to the Debtors' continued operations and reorganization.

48.     The Debtors' employees (collectively, the "<u>Workforce</u>") perform a wide variety of functions critical to the Debtors' operations, the administration of the Chapter 11 Cases, and the Debtors' successful reorganization.

49.     The Workforce is the most important part of the Debtors' business. I believe that any delay in paying or failure to pay prepetition Workforce Obligations could irreparably impair the morale of the Workforce at the time when their dedication, confidence, retention, and cooperation are crucial. Failure to pay the Employee Obligations could also inflict a significant financial hardship on the Employees' families. The Debtors cannot risk such a substantial disruption to their business operations, and it is inequitable to put Employees at risk of such hardship. Without this relief, otherwise-loyal Employees may seek other work opportunities, thereby putting at risk the Debtors' continued operation as a reorganized enterprise. Payment of these obligations in the ordinary course of business would enable the Debtors to focus on completing a successful sale of their assets, which would benefit all parties in interest.

50.     As of the Petition Date, there are 305 Employees working in Texas, Colorado, Wyoming, Oklahoma, Pennsylvania, and New Mexico.  There are 22 Employees working in the corporate office located at 5555 San Felipe, Suite 1250, Houston, Texas 77056.  There are 47 Employees working in the field services locations in Colorado, Wyoming, Oklahoma, Texas, and Pennsylvania.  There are 236 Employees working at the manufacturing locations in Colorado, Oklahoma, and Texas.

**Wage and Salary**

51.     In the ordinary course of business, the Debtors pay their Workforce bi-weekly, with the next payroll falling on March 27, 2020.  Thus, the Debtors estimate that as of the Petition Date, approximately $460,000.00 is owed on account of accrued and unpaid wages and salaries for the

Employees.  In addition, the Unpaid Compensation as of the Petition Date also includes an estimated $190,000.00 owed to independent contractors and staffing agencies, which will become due within 14 days of the Petition Date.

52.     In addition to the wages and salaries of the Workforce, in the ordinary course of their business, the Debtors pay bonuses to certain employees based on an annual management incentive plan. For the 2019 annual incentive plan, the bonuses are determined differently for each individual employee based on six targets, including revenue, EBITDA, financial metrics (utilization, inventory turns, and new customer revenue), delivery times, purchase price variance, collection turns, and safety. Under the 2019 annual incentive plan, the total payout would be approximately $400,000 due on March 31, 2020, but the Debtors only seek authority to pay a total of $142,364 as a result of no employee receiving more than the $13,650 cap under section 507(a)(4).

**Other Compensation and Expenses**

53.     The Debtors utilize Paylocity Corporation to manage and run their payroll. As of the Petition Date, the Debtors estimate that they owe $10,000.00 to Paylocity. Disruption to Paylocity managing the Debtors' payroll would likely disrupt pay to the Debtors' Workforce.

**Reimbursable Expenses**

54.     In the ordinary course of their business, the Debtors reimburse their Workforce for certain expenses, which includes amounts charged to corporate credit and gas cards. With the corporate cards, employees pay for tools and equipment the Debtors use in their operations, as well as office supplies, consulting fees, vehicle maintenance, repair and maintenance of the Debtors' property, and travel and meals. As of the Petition Date, the Debtors owe approximately $74,000 for reimbursable expenses for their Workforce.

**Workforce Benefit Programs**

55.     Prepetition the Debtors maintained benefit programs for their Workforce, including medical, vision, dental, AD&D coverage, business travel accident, short- and long-term disability, pretax health care expense accounts, retirement account benefits, and wellness incentives (the "Workforce Benefit Programs"). As of the Petition Date, the Debtors believe that they owe $226,600 under their Workforce Benefit Programs.

56.     The Debtors further request authority to pay any related administrative fees under the Consolidated Omnibus Budget Reconciliation Act of 1985 ("COBRA"). The Debtors have a self-funded COBRA plan and they believe that, as of the Petition Date, they owe $1,100 on account of COBRA benefits.

57.     I believe that the Debtors' performance of their obligations under the above-described Workforce Benefit Programs is important for preserving the value of the Debtors' estates. Any disruption in the benefits under such programs will call into question the Debtors' commitment to their Workforce, who are essential to the Debtors' wind down operations.

**Employee Withholdings**

58.     In connection with paying the Unpaid Compensation and the Workforce Benefit Programs, the Debtors routinely deduct and/or withhold from the Workforce's paychecks amounts that the Debtors are required to transmit to third parties. For example, the Debtors may deduct, among other things, (a) payroll taxes related to federal, state, and local income taxes, FICA, Social Security, and Medicare taxes for remittance to the appropriate federal, state, or local taxing authority; (b) employee contributions for health benefits and health care and dependent care spending accounts; (c) employee contributions to employee life insurance, long-term disability insurance, and personal accident insurance; and (d) legally ordered deductions, such as child

support and garnishments (collectively, the "Employee Withholdings"). The Debtors then forward amounts equal to the Employee Withholdings from general operating accounts to appropriate third-party recipients.

59.     Generally, these funds are deducted from earnings, but due to the commencement of the Chapter 11 Cases, may not have been forwarded to the appropriate third-party recipients. Such withheld funds, to the extent they remain in the Debtors' possession, may constitute moneys held in trust and therefore may not be property of the Debtors' estates. As of the Petition Date, the Debtors estimate that they owe approximately $180,000 on account of Employee Withholdings.  I believe the relief requested in the Employee Wages Motion is necessary to avoid immediate and irreparable harm and is in the best interests of the Debtors, their estates, and all parties in interest.

**iv. Insurance Motion**

60.     In the course of their operations, the Debtors maintain insurance policies covering, *inter alia*, automobile liability, commercial inland marine, cyber, management liability and crime, excess directors' and officers' liability, flood, property, umbrella liability, workers' compensation, and general liability (each an "Insurance Policy" and collectively, as discussed herein, the "Insurance Policies").[7]  A detailed list of the Insurance Policies is attached hereto as **Exhibit A**. The Debtors incur certain obligations to pay premiums and other obligations related to the Insurance Policies, including, but not limited to, taxes, other fees, and deductibles (collectively, the "Insurance Obligations"), in accordance with or relating to their respective Insurance Policies through several insurance carriers (each an "Insurance Carrier").  The Debtors are currently either prosecuting claims or have outstanding claims against certain of the Insurance Policies.

---

[7] In addition to the Insurance Policies discussed in this Motion, the Debtors maintain numerous insurance programs *See Debtors' Emergency Motion to (i) Pay Prepetition Wages, Salaries, and Other Compensation and (ii) Continue Employee Benefit Programs* filed contemporaneously with this Motion.

10426333v8

61.     The Debtors maintain their Automobile Policy, Umbrella Policy, General Liability Policy, and Workers' Compensation Insurance (each as defined below) as a bundled package (the "Berkley Insurance Policies") through Berkley National Insurance Company.  The Debtors believe as of the Petition Date that the outstanding amount for premiums owed for the Berkley Insurance Policies is $638,769.41, paid in stepped-down monthly installments (each a "Berkley Installment Payment").  Each Berkley Installment Payment is due on the 13th day of each month.  The March 13, 2020 and April 13, 2020 Berkley Installment Payments are $160,521.45 each, and the May 13, 2020 and June 13, 2020 Berkley Installment Payments are $158,863.25 each.

**Insurance Premium Financing**

62.     The Debtors are party to two premium financing agreements (the "Premium Finance Agreements") with AFCO Premium Credit LLC ("AFCO").  The following Insurance Policies have annual premiums that are paid in full by AFCO (the "Financed Policies"): (i) the Excess Directors & Officers Policies (as defined below) with Travelers Casualty and Surety of America and XL Specialty Insurance Company; (ii) the Management Liability and Crime Policy (as defined below); and (iii) the Property Insurance Policy (as defined below).  Although there are two Premium Finance Agreements, payments are made in one monthly lump sum installment for each policy. The approximate total of the Financed Policies' premiums is $333,588.34.  The Financed Policies are financed at an annual percentage rate of 4.949% for both Premium Finance Agreements. Collectively, there is a total finance charge of $9,220.03.  The Debtors believe as of the Petition Date that the outstanding amount owed to AFCO under the Premium Finance Agreements is $312,195.10, which is paid in monthly installments of $44,599.30 on the 28th day of each month.

**Automobile Policy**

63.     The Debtors maintain automobile liability, medical, personal injury, and uninsured/underinsured motorist insurance (the "Automobile Policy"). The Automobile Policy provides third party liability coverage and automobile physical damage coverage for the ownership and use of scheduled automobiles. Berkley National Insurance Company is the Insurance Carrier for the Automobile Policy. The Automobile Policy covers $1,000,000 of liability, $5,000 of medical pay, $2,500 of personal injury protection, and $1,000,000 of uninsured/underinsured motorist coverage. The Automobile Policy includes a $1,000 deductible per occurrence and an annual premium of $374,691.00, paid in installments. The coverage period for the Automobile Policy is October 13, 2019, through October 13, 2020. Each installment payment is paid as part of the monthly Berkley Installment Payment.

**Commercial Inland Marine Policy**

64.     The Debtors maintain commercial inland marine insurance (the "Inland Marine Policy"). The Inland Marine Policy provides coverage for physical damage to construction equipment. Insurance Carrier for the Inland Marine Policy is The Travelers Lloyds Insurance Company. The Inland Marine Policy provides $4,124,575 of coverage for listed items, with a $10,000 deductible per occurrence with the exception of a crane deductible, which is a minimum of $10,000 up to 5% of the limit of insurance. In addition, the Inland Marine Policy provides $100,000 of coverage for unlisted items not to exceed $2,500 per item, with a $10,000 deductible per occurrence. There is $500,000 of coverage per item for leased or rented items, with a $10,000 deductible per occurrence. In addition, the Inland Marine Policy provides the following coverage extensions:

- $500,000 of coverage for newly acquired contractors equipment, with a $10,000 deductible per occurrence.

- $5,000 per item for the rental cost of replacement items and $100,000 per item for

the loss of any one replacement item, with a $10,000 deductible per occurrence.

- $10,000 of coverage for continuing rental payments, not to exceed $5,000 per item, with a $2,500 deductible per occurrence and a $5,000 deductible for installation.

- The Flood Limit of Inland Marine Policy is $4,124,575 and a Flood Annual Aggregate Limit of $4,124,575, with a $10,000 deductible per occurrence and a $25,000 deductible for installation.

- The Earth Movement Limit of Inland Marine Policy is $4,124,575, with an Earth Movement Annual Aggregate Limit of $4,124,575, with a $10,000 deductible per occurrence and a $25,000 deductible for installation.

The coverage period is December 13, 2019 to October 13, 2020. The annual premium for the Inland Marine Policy is $65,775.00. As of the Petition Date, the Debtors do not believe they owe any amount under the Inland Marine Policy.

**Cyber Liability Policy**

65.    The Debtors maintain cyber liability insurance (the "Cyber Policy") covering a range of areas, including security and privacy, multimedia and intellectual property. The Cyber Policy provides direct loss and liability protection for risks created by the use of technology and data in an organization's operations. The Insurance Carrier is Lloyd's Syndicate 2001. The Cyber Policy provides $3,000,000 in coverage for security and privacy liability, multimedia and intellectual property, network interruption and recovery, event support expenses, privacy regulatory defense and penalties, network extortion, and reputational damage. It also provides $250,000 in coverage for electronic theft, computer fraud and telecommunications fraud and social engineering fraud. The total limit of liability is $3,000,000. The Cyber Policy has a $25,000 deductible for each and every claim including expenses for security and privacy liability, multimedia and intellectual property, privacy regulatory defense and penalties, event support expenses, network extortion, electronic theft, computer fraud & telecommunications fraud, social engineering fraud, and reputational damage. Lastly, the deductible for network interruption and

24

recovery is $25,000 for each and every claim and loss of business income coverage.  The coverage period is October 13, 2019 to October 13, 2020.  The annual premium is $17,095.00.  As of the Petition Date, the Debtors do not believe they owe any amount under the Cyber Policy.

**Management Liability and Crime Policy**

66.     The Debtors maintain management liability and crime insurance (the "Management Liability and Crime Policy"), which provides preventative protection against a variety of liability and damages associated with the Debtors' directors, officers, and other upper management; specifically the following areas, each within the first layer of coverage:

- Directors and Officers Liability: This provides coverage for liability arising from the Debtors' directors and officers for alleged wrongful acts.  Liability is covered up to $2,000,000 in aggregate for the coverage period, with a $0 to $25,000 deducible.

- Employment Practices Liability: This provides coverage against claims made by employees alleging discrimination, wrongful termination, harassment, and other employment-related issues against the Debtors.  Liability is covered up to $2,000,000 in the aggregate for the covered period, with a $50,000 deducible.

- Fiduciary Duty Liability: This provides coverage for claims of mismanagement of the Debtors' employee benefit plans.  Liability is covered up to $2,000,000, with a settlement program sublimit of $100,000.  There is no deducible.

- Commercial Crime Insurance: This provides coverage for liability accruing to the Debtors from an employee's theft, loss to customer property, certain losses inside the premises, certain losses outside the premises, forgery or alteration, computer fraud, and currency fraud.  Liability is covered up to $2,000,000 for the coverage period, with a $25,000 deducible.  Employee theft has an investigation sublimit of $100,000.

The Insurance Carrier is Arch Insurance Company.  The coverage period for the Management Liability and Crime Policy is October 28, 2019 to October 28, 2020.  The premium for the Management Liability and Crime Policy is $39,143.00, paid in installments.  The Management Liability and Crime Policy premiums are financed through AFCO and paid in monthly installments in accordance with the Premium Financing Agreements.

10426333v8

**Excess Directors and Officers Liability**

67.     The Debtors maintain excess directors and officers liability insurance (the "Excess D&O Policies"), which provides legal liability coverage for the negligent or wrongful acts of directors and officers solely in their capacity as such, and in excess of the Management Liability and Crime Policy.  The Insurance Carriers are Travelers Casualty and Surety of America, XL Specialty Insurance Company, AXIS Insurance Company, and Endurance American Insurance Company.  The Travelers Casualty and Surety of America policy covers $1,000,000 excess of $2,000,000, with a $1,610 annual premium and a $1,610 retention.  Its coverage includes employee dishonesty, losses on or off the premises, forgery, computer crimes, and theft or destruction of money and securities. The XL Specialty Insurance Company policy covers $3,000,000 excess of $2,000,000, with a $50,000 annual premium and a $50,000 retention.  The AXIS Insurance Company policy covers $3,000,000 excess of $5,000,000, with a $45,000 annual premium and a $45,000 retention.  The Endurance American Insurance Company policy covers $2,000,000 excess of $8,000,000, with a $25,000 annual premium and a $25,000 retention.  The coverage period for each of the Excess D&O Policies is October 28, 2019 through October 28, 2020.  The Travelers Casualty and Surety of America policy premiums and the XL Specialty Insurance Company policy premiums are financed by AFCO and paid in monthly installments in accordance with the Premium Financing Agreements.  As of the Petition Date, the Debtors do not believe they owe any amounts under the Axis Insurance Company policy or the Endurance American Insurance Company policy.

**Flood Insurance Policy**

68.     The Debtors maintain a flood insurance policy, which covers a building and its contents located at 1703 S. Main Street, Building 5, Elk City, OK 73644 (the "Flood Insurance

Policy"). The Insurance Carrier is Homesite Insurance Company. The Flood Insurance Policy covers $500,000 of flood damage to the building and the contents of the building, with a $1,250 deductible for the flood damage to the building and the contents of the building. The coverage period for the Flood Insurance Policy is November 28, 2019 through November 28, 2020. It has an annual premium of $2,181.00. As of the Petition Date, the Debtors do not believe they owe any amount under the Flood Insurance Policy.

**Business Property Insurance Policy**

69.     The Debtors maintain business property insurance (the "Property Insurance Policy") providing coverage for all risks of physical loss or damage to scheduled property, businesses personal property, and certain property of others. The Insurance Carrier is Zurich American Insurance Company. The Property Insurance Policy provides coverage up to a total limit of $50,000,000, regardless of the number of properties involved, for the scheduled locations and certain miscellaneous unnamed locations.

70.     In addition, the Property Insurance Policy provides coverage as follows: (i) time element coverage only at 5100 and 5120 Boyd Lake Ave., Loveland, CO 80538 up to a limit of $25,089,169.00, which is subject to various sublimits and for all other scheduled locations, sublimited to $10,000; (ii) accounts receivable up to $500,000; (iii) computer systems damage up to $100,000; (iv) contingent time element coverage per location and occurrence up to $2,500,000 and indirect dependent time element coverage up to $1,000,000; (v) debris removal up to $5,000,000; (vi) decontamination costs up to $100,000; (vii) deferred payments up to $1,000,000; (viii) errors and omissions up to $1,000,000; (ix) expediting costs up to $1,000,000; (x) fine arts up to $50,000; (xi) fire department service charges up to $1,000,000; (xii) increased cost of construction up to $5,000,000; (xiii) land and water contaminant clean up to $100,000; (xiv) land

improvements up to $250,000; (xv) miscellaneous personal property up to $2,500,000; (xvi) miscellaneous unnamed locations up to $2,500,000; (xvii) off premises service interruption up to $2,500,000; (xviii) professional fees up to $1,000,000; (xix) radioactive decontamination up to $100,000; (xx) tenants prohibited access up to $100,000; (xxi) transit up to $2,500,000; (xxii) valuable papers and records up to $1,000,000; (xxiii) new construction up to $2,500,000; (xxiv) new construction and additions up to $2,500,000; (xxv) break down of equipment up to $50,000,000; (xxvi) earth movement up to $50,000,000, with a $5,000,000 sublimit for newly acquired locations and a $2,500,000 limit for miscellaneous unnamed locations; (xxvii) flood up to $50,000,000, with sublimits of $5,000,000 to $10,000,000 for named storm zone dependent, $5,000,000 for newly acquired locations, and $2,500,000 for miscellaneous unnamed locations; (xxviii) contractors' equipment up to $250,000; and (xxix) cyber events, per occurrence and in the annual aggregate up to $100,000.  Each of the preceding categories of coverage has a $100,000 deductible for combined property damage and time element per occurrence, except for time element coverage at the Loveland, CO locations and contingent time element location and occurrence coverage, which both have a $100,000 per location deductible.

71.     The coverage period is November 27, 2019 to October 13, 2020.  The annual premium is $171,053.33, which is financed through AFCO and paid in monthly installments in accordance with the Premium Financing Agreements.

**Umbrella Policy**

72.     The Debtors maintain an umbrella policy, which provides excess legal liability coverage for bodily injury and property damage to third parties for losses in excess of the limits

10426333v8

provided by the primary policies (the "Umbrella Policy").[8]   The Umbrella Policy covers $25,000,000 for each occurrence of bodily injury, property damage, personal and advertising injury, other aggregate limit (except covered automobiles and products-completed operations), and the products-completed aggregate limit.  There is a $10,000 self-insured retention per occurrence. The Insurance Carrier for the Umbrella Policy is Berkley National Insurance Company.  The annual premium is $379,383.00, paid in installments.  The coverage period is October 13, 2019 through October 13, 2020.  Each installment payment is paid as part of the monthly Berkley Installment Payment.

**Workers' Compensation Insurance**

73.     In the ordinary course of business, the Debtors maintain workers' compensation insurance (the "Workers' Compensation Policy") for claims arising from or related to employment by the Debtors (the "Workers' Compensation Claims").  The Insurance Carrier for the Workers' Compensation Policy is Berkley National Insurance Company.  In many instances, applicable law in the jurisdictions in which the Debtors operate requires that the Debtors maintain Workers' Compensation Policy. The Workers' Compensation Policy covers, among other things, bodily injury by accident, bodily injury or disease sustained by employees in the course of their employment with the Debtors.  The Workers' Compensation Policy has a coverage limit for each bodily injury by accident or disease up to $1,000,000 and a policy limit for bodily injury or disease of $1,000,000.  The Workers' Compensation Policy does not have a deductible.

---

[8] The policies covered by the excess coverage are: the General Liability Policy (as defined below), the Automobile Liability Policy, and the Workers' Compensation Insurance Policy (as defined below).

74.     The coverage period for the Workers' Compensation Policy is October 13, 2019 through October 13, 2020.  There is an annual premium of $738,421.00, paid in installments.  Each installment payment is paid as part of the monthly Berkley Installment Payment.

75.     Due to the nature of their business, some of the Debtors' employees may be exposed to certain occupational hazards.  The Workers' Compensation Policy requires no deductible, and thus the Debtors owe no amounts for Workers' Compensation Claims. All amounts owed for Workers' Compensation Claims are paid by Berkley National Insurance Company up to the applicable limits. Accordingly, to the best of their knowledge, the Debtors do not owe any prepetition amounts on account of Workers' Compensation Claims.

76.     Under applicable workers' compensation laws, the Debtors or the applicable Insurance Carrier may be obligated to pay all or part of a Workers' Compensation Claim directly to an employee, his or her other medical providers, or his or her heirs or legal representatives. Certain Workers' Compensation Claims arose prepetition and remain open and pending.  To that end, the Debtors seek relief from the automatic stay for authorization to pay such Workers' Compensation Claims and related costs, and for Berkley National Insurance Company to have authorization to do the same.

**General Liability Policy**

77.     The General Liability Policy provides for coverage of bodily injury or property damage to third parties, and errors and omissions committed in the administration of employee benefits plans.  The General Liability Policy provides as follows:

- Coverage up to a general aggregate amount of $2,000,000;

- Coverage for products-completed operations up to an aggregate limit of $2,000,000;

- Coverage for each occurrence up to a limit of $1,000,000;

30

- Coverage for personal & advertising injury up to a limit of $1,000,000;

- Coverage for damage to premises rented to the Debtors up to a limit of $100,000;

- Coverage for medical expenses up to a limit of $5,000 for bodily injury caused by an occurrence attributable to the Debtors' operations, premises the Debtor owns or rents, or on ways next to premises the Debtors own or rent; and

- Coverage for errors and omissions committed in administering employee benefits plans up to a limit of $1,000,000 for each employee and up to an aggregate limit of $2,000,000, with a $1,000 deductible for each employee.

The Insurance Carrier is Berkley National Insurance Company. The annual premium is $216,300.00, which the Debtors pay in monthly installments. The coverage period is October 13, 2019 through October 13, 2020.  Each installment payment is paid as part of the monthly Berkley Installment Payment.

### v.  Taxes Motion

78.    I understand that the taxes the Debtors typically incur generally fall into the following categories: Sales and Use Taxes, Income Taxes, Payroll Taxes, Property/Ad Valorem Taxes, and Franchise Taxes (each as defined in the Taxes Motion and collectively, the "Taxes"). A non-exclusive list of the Taxing Authorities is set forth on **Exhibit A** to the Taxes Motion.

### Sales & Use Taxes

79.    The Debtors incur or collect a variety of sales taxes in connection with the sale of the Debtors' goods and services (the "Sales Taxes").

### Income Taxes

80.    In the ordinary course of operating their businesses, the Debtors pay a de minimis amount in state income taxes.  All federal taxable income/(loss) is allocated to the equity partners. The aggregate taxable income/(loss) from operations "passes through" FR Tri-Point LLC to its equity partners. The equity partners receive a K-1 with its share of flow-through taxable income from FR Tri-Point LLC. The equity partners, in turn, consolidate its income and/or expenses along

31

with income and/or losses per the K-1 from FR Tri-Point LLC to calculate its taxable income and resulting federal income tax liability at the equity partner level.

**Payroll Taxes**

81.     As set forth in the Debtors' Employee Wages Motion,[9] in the normal course of business, payroll related to trust fund taxes accrue as employees provide services to the Debtors. Where applicable, these payroll related taxes include federal, state, and local income tax, social security tax, Medicare, state unemployment insurance, and state disability insurance (collectively, the "Payroll Taxes").  Generally, these funds are deducted from employee earnings, but due to the commencement of the Chapter 11 Cases, may not have been forwarded to the appropriate third-party recipients.  Such withheld funds, to the extent they remain in the Debtors' possession, constitute moneys held in trust and therefore are not property of the Debtors' estates. Out of an abundance of caution, however, by this Motion, the Debtors seek authority, in their discretion, to forward the Payroll Taxes to the appropriate parties in the ordinary course.

**Property Taxes/Ad Valorem Taxes**

82.     The Debtors own, or owned, lease, or leased property in Colorado, New Mexico, Oklahoma, Utah, and Texas, and certain Taxing Authorities in these states have the authority to levy property occupancy taxes, real estate taxes, and other property taxes against the Debtors' real and personal property (the "Property Taxes").  As of the Petition Date, the Debtors are delinquent in the payment of $411.73 in property taxes to Sherry Nightengale, Washita County Treasurer, PO Box 416, Cordell, OK 73632.  As of the Petition Date, the Debtors do not believe any other amounts are outstanding on account of the Property Taxes; however, certain Property Taxes

---

[9]     *Debtors' Emergency Motion to (I) Pay Prepetition Wages, Salaries, And Other Compensation, and (II) Continue Employee Benefit Programs*, filed contemporaneously with this Motion.

attributable to the prepetition period may come due during the Chapter 11 Cases.  Thus, the Debtors

request authority to pay all prepetition Property Taxes that have accrued as of the Petition Date

and to continue to pay such obligations in the ordinary course on a postpetition basis.

**Franchise Taxes**

83.     The Debtors are required to pay taxes assessed for the privilege of doing business

within a particular jurisdiction (the "<u>Franchise Taxes</u>").  The Debtors pay Franchise Taxes to the

applicable Taxing Authorities in Texas.  Franchise Taxes for other states are typically filed as part

of the income tax return.  Franchise Taxes can be paid quarterly or annually to the applicable

Taxing Authorities.  As of the Petition Date, the Debtors do not believe they owe any prepetition

Franchise Taxes.  The Debtors request authority to honor any prepetition Franchise Taxes, to the

extent any exist, and to pay any postpetition Franchise Taxes in the ordinary course of business.

### vi.   Utilities Motion

84.     As more fully described in the motion, the Debtors will incur expenses for gas,

electricity, water, waste, internet, telecommunications, and other utility products and services

(collectively, the "<u>Utility Services</u>") provided by 65 utility providers (collectively, the "<u>Utility

Companies</u>"), a list of which is attached as **<u>Exhibit A</u>** to the Utilities Motion (the "<u>Utility Company

List</u>").  On average, the Debtors spend approximately $90,000 each month on utility costs to the

Utility Companies, as calculated for the twelve-month period ended December 2019.

85.     I believe that uninterrupted Utility Services are essential to the Debtors' ongoing

operations and the success of the Chapter 11 Cases. Uninterrupted utility services are essential to

the Debtors' ongoing operations and, therefore, to the success of these cases. Indeed, any

interruption of utility services, even for a brief period, would seriously jeopardizing the Debtors'

proposed sales and, ultimately, recoveries to creditors. It is therefore critical that utility services continue uninterrupted during the Chapter 11 Cases.

86.     I believe and am advised that the Adequate Assurance Procedures (as defined in the Utilities Motion) are necessary to the success of the Debtors' Chapter 11 Cases because if such procedures are not approved, the Debtors could be forced to address numerous requests by Utility Companies for adequate assurance in a disorganized manner during the critical first weeks of the Chapter 11 Cases. Discontinuation of Utility Service could disrupt operations and jeopardize the Debtors' reorganization efforts and, ultimately, the value of the Debtors' estates and stakeholders' recoveries.

87.     Based on the foregoing, I believe that the relief requested in the Utilities Motion would ensure the continuation of the Debtors' businesses at this critical juncture as the Debtors transition into Chapter 11. Furthermore, I believe that the relief requested provides the Utility Companies with a fair and orderly procedure for determining requests for additional adequate assurance. Accordingly, I believe that the relief requested in the Utilities Motion should be granted in all respects.

### vii.   Motion to Sell Real Property

88.     As more fully described in the motion, the Debtors seek to auction their Oklahoma Property and their Texas Property on March 23, 2020.  I believe that the Debtors will receive the highest and best offer for the Properties through the previously scheduled Auctions, the dates for which have been publicized for weeks prior to the Petition Date.  The Debtors no longer conduct operations on the Oklahoma Property or the Texas Property.  I believe the auction and sale of the Properties is accordingly an exercise of the Debtors' business judgment and is in the best interest of the Debtors' estates.

34

10426333v8

89.     In order to facilitate the sale of the Properties, the Debtors entered into certain Engagement Agreements with Newmark Real Estate of Houston, LLC, d/b/a Newmark Knight Frank, as broker, and Ten-X, Inc., as auctioneer, in order to market, auction and sell the Properties. In order to successfully market, auction and sell the Properties, the Debtors require the assistance of a broker and auctioneer.  I believe that the assumption of the Engagement Agreements is in the best interest of the Debtors' estates.

90.     Lastly, the Debtors seek to pay the Brokers' and Ten-X's Transaction Fees out of the proceeds of the sales of the Properties.  I believe and am advised that the Debtors would incur post-petition administrative expenses if the Debtors are not authorized to pay the Transaction Fees out of the proceeds of the sales of the Properties.  I believe the payment of the Broker and Ten-X constitutes a sound business justification for the authorization of payment.

91.     Accordingly, I believe that the relief requested in the Motion to Sell Real Property should be granted in all respects.

### viii.   Request for Emergency Consideration

92.     The Debtors request emergency consideration of the Joint Administration Motion; the Creditor List Motion; Claims Agent Retention Application; the Cash Collateral/DIP Motion; the Cash Management Motion; the Employee Wages Motion; the Insurance Motion; the Taxes Motion; the Utilities Motion; and the Motion to Sell Real Property. I believe that, based on the complexity of the Chapter 11 Cases (as explained to me by the Debtors' counsel) and the Debtors' urgent need to continue operations during these cases, emergency consideration of such motions is warranted.

## CONCLUSION

93.     The above describes the Debtors' business and capital structure, the factors that precipitated the commencement of the Chapter 11 Cases, and the terms of the Debtors' orderly

10426333v8

liquidation and wind-down. The provisions of the Bankruptcy Code will assist the Debtors in achieving an orderly liquidation of their assets and wind down their remaining operations for the benefit of their economic stakeholders and employees.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: March 17, 2020.
**Houston, Texas**

By:    */s/ Jeffrey Martini*
Name: Jeffrey Martini